FILED

08/25/2020

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
October 2, 2019 Session

**STATE OF TENNESSEE v. MARQUICEON FIELDS**

**Appeal from the Criminal Court for Shelby County
No. 16-06290       John Wheeler Campbell, Judge**

_____

**No. W2018-02014-CCA-R3-CD**
_____

The Defendant, Marquiceon Fields, was convicted of one count of rape of a child and was sentenced to twenty-eight years' incarceration. On appeal, the Defendant argues that the trial court erred by failing to require the State to make an election of offenses, that the evidence is insufficient to support the Defendant's conviction, and that the trial court erred by sentencing the Defendant as a Range II offender. The State concedes that the trial court erred in sentencing the Defendant. Based on our review of the record and applicable authorities, we affirm the Defendant's conviction but modify his sentence to twenty-five years and remand for entry of an amended judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court
Affirmed in Part; Modified in Part; Case Remanded**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Lance R. Chism, Memphis, Tennessee (on appeal); Phyllis Aluko, Chief Public Defender, and Constance Barnes, Assistant Public Defender (at trial), for the appellant, Marquiceon Fields.

Herbert H. Slatery III, Attorney General and Reporter; Katharine K. Decker, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Lessie Rainey and Stacy McEndree, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

On November 10, 2016, the Defendant was indicted for one count of rape of a child and one count of aggravated statutory rape. Count One of the indictment alleged that the Defendant sexually penetrated the victim between April 14, 2009, and November

24, 2010, when the victim was less than thirteen years old. Count Two alleged that the Defendant sexually penetrated the victim between November 24, 2010, and December 31, 2011, when the victim was thirteen years or older and that the Defendant was at least ten years older than the victim.

At trial, the victim testified that she was born on November 24, 1997, and that she was twenty years old at the time of trial. The victim testified that the Defendant was her first cousin and that their fathers were brothers. The victim used to see the Defendant every weekend and over holidays. The victim and the Defendant were close, and she trusted and confided in him.

The victim testified that when she was six or seven years old, the Defendant would fondle her breasts and buttocks while they were wrestling. The victim testified that the "first time" the Defendant "molested" her occurred in September of 2010 when she was twelve years old. She recalled it was around the time that her paternal grandmother, Carolyn Fields, got custody of the victim and her younger brother. The victim also recalled talking to her family about her thirteenth birthday being only two months away. The victim testified that the incident began late at night when she and the Defendant were in the living room of her grandmother's house watching television while her grandparents and her brother were upstairs. The Defendant pulled the victim onto his lap, and the victim told him that she was not supposed to sit on anyone's lap. He pulled his penis over the waistband of his gray jogging pants and asked the victim to play with it. The victim had never seen the Defendant's penis before that day. The Defendant pulled the victim's hands down toward his penis, but she pulled away. The victim said that the incident made her uncomfortable, but she did not try to yell or alert her grandparents.

About an hour or so later, the victim went upstairs to the bedroom she shared with her younger brother, which was next to her grandparents' bedroom. The victim testified that she slept in the same king sized bed as her brother, who usually slept "on the far opposite end" of the bed and was a "hard sleeper." The victim testified that she began dozing off while watching the show Family Guy on television. The Defendant then came into the room, told her to be quiet, and pulled down his pants and the victim's pants. The victim demonstrated for the jury how the Defendant touched her leg as he pulled her under the covers. The victim told him to stop, but the Defendant again told her to be quiet. The Defendant penetrated the victim's vagina with his penis. The victim said "ouch, stop it," and the Defendant replied "it's okay, it's nothing but my dick biting you." The victim testified that it lasted two or three minutes. The victim testified that she did not yell for help and that neither her brother nor her grandparents woke up. When the Defendant finished, he left the room and told the victim to go to the bathroom, where the victim took a shower before returning to bed. The victim testified that she was "a hundred percent" sure that she was only twelve years old at that time.

The victim testified that incident was not the only time it happened: "He used to come over almost every weekend, so I can't just say. It was pretty often. I don't – I can't just give a number of times but it was often." She testified that it happened both in Memphis and at the Defendant's mother's house in Mississippi. She also testified that it continued after her thirteenth birthday, which was on November 24, 2010. The victim testified that the Defendant did not always rape her vaginally but that he had also "done anal" with her before. The victim testified that "it happened so often" that she stopped saying no.

The victim testified that she was previously raped by her father's friend when she was twelve years old. She testified that it occurred in the summertime, a few months before she was first raped by the Defendant. The victim told her family about the rape by the friend, but "they did nothing about it." Her family also accused her of being a liar. Because of this experience, the victim believed that she could not tell her family about the rapes by the Defendant. The victim also testified that she was afraid of the Defendant because he told her that he was a chief enforcer in the Vice Lords gang and that he could get people to "do stuff" to her. The Defendant also threatened to kill the victim if she told anyone, and he told her that she could get in trouble and end up in foster care.

The victim recalled that the "last time" the Defendant raped her was in May 2011, a few of months after her thirteenth birthday and a few days before her track meet. This rape also occurred at her grandmother's house in a bedroom that had been built for the victim on the first floor. The victim recalled that the Defendant penetrated her vaginally while she was on her hands and knees and that he "didn't pull out" before he ejaculated. The victim discovered that she was pregnant eight months later when her mother, Melissa Holmes, noticed her protruding stomach and took her to the hospital for an ultrasound. The victim's child was born a few weeks later on February 25, 2012. Ms. Holmes asked if any of the victim's family members were molesting her, or if one was the father of the victim's child, which the victim denied. The victim testified that the Defendant told her to tell people that the father of her child was "a guy that [she] had been talking to for one day named Jared," but a DNA test confirmed that he was not the father. After that, the victim claimed that she did not know who was the father of her child.

The victim testified that when she was eighteen years old, she moved out into her own apartment. One night, her boyfriend at the time, Darius Williams, touched her in a way that reminded her of the Defendant. She began crying and told him the truth. The victim testified that was the first time she told anyone about what the Defendant had done. Several months later, the victim told her best friend and her mother that she knew that the Defendant was the father of her child. The victim and Ms. Holmes went to the victim's uncle's house where her father's family was having a gathering for Mother's Day. The victim spoke to her father first, and then Ms. Holmes told the victim's grandparents, who accused the victim of lying. They called the Defendant and told him

that the victim was accusing him of raping her. The Defendant came over and threatened to kill the victim. The Defendant was "trying to get at" the victim but was held back by his father. The family told the Defendant to leave before the police arrived.

Two days later, the victim came to the police station to give a statement. The victim picked the Defendant out of a photographic lineup as the man who raped her when she was twelve years old. The victim told the police that the Defendant's penis was uncircumcised. The police also took cheek swabs from both the victim and her child.

On cross-examination, the victim denied having a case worker or guardian ad litem during the custody proceedings to whom she could report what was happening when she was twelve years old. The victim agreed that in 2012, she claimed that someone else was the father of her child. The victim also agreed that she did not report that the Defendant had raped her and was the father of her child until 2016. She initially told her boyfriend "a little after Christmas" and then told the rest of her family on Mother's Day. The victim denied having seen pictures of the Defendant's penis on his tablet or having walked in on the Defendant using the restroom. The victim agreed that her younger brother was usually with her and the Defendant at her grandmother's house or the Defendant's mother's house.

Darius Williams, the victim's ex-boyfriend, testified that he had known the victim since ninth grade, when she was thirteen and he was fourteen. Mr. Williams had also known the Defendant since Mr. Williams was ten years old. In 2016, Mr. Williams and the victim were in a romantic relationship and were living together. Mr. Williams testified that one time when he and the victim were in bed, he "touched her a certain way," and the victim pulled away and started to cry. Mr. Williams asked the victim what was going on, and the victim told him that "[i]t reminded her of the rapes." Mr. Williams testified that the victim told him everything that had happened. On cross-examination, Mr. Williams testified that he and the victim had talked about the possibility that he was the father of her child because they had dated for a while in the ninth grade, but they never did a paternity test.

Melissa Holmes, the victim's mother, testified that she was not always able to take care of her children after she separated from the victim's father. Initially, the victim and her younger brother would go back and forth between their mother's house and the house of their paternal grandmother, Carolyn Fields. After several months of this arrangement, Ms. Fields petitioned for custody of the children. Ms. Holmes testified that in September of 2010, the victim and her brother were primarily staying with Ms. Fields. When Ms. Fields was awarded full custody, Ms. Holmes did not have any visitation rights and was only able to see her daughter on limited occasions. On one of those occasions, Ms. Holmes noticed a line on the victim's stomach. Ms. Holmes asked if the victim was having sex, and the victim said she did not want to talk about it. Ms. Holmes testified

- 4 -

that she suggested to Ms. Fields that the victim should be checked out by a doctor but that it never happened. Later, Ms. Holmes noticed that the victim "looked very pregnant" because her stomach was swollen. Ms. Holmes took the victim to the emergency room, where they discovered that the victim was eight months pregnant. Ms. Holmes asked the victim who the father was, and the victim said that she did not want to talk about it. Ms. Holmes testified that she specifically asked the victim whether the victim's father, grandfather, or uncles had been "messing" with her, and the victim denied each one. However, when Ms. Holmes asked about the Defendant, the victim said that she did not want to talk about it. Ms. Holmes testified that she reported her suspicions to the victim's guardian ad litem but that she did not hear anything further about an investigation.

Ms. Holmes testified that on Mother's Day of 2016, the victim called her crying and saying that everything Ms. Holmes had suspected was true. The victim told Ms. Holmes that the Defendant had been molesting her since she was twelve years old. Ms. Holmes called the victim's father. Then, Ms. Holmes picked up the victim and brought her to the family gathering at the victim's uncle's house. After the victim spoke to her father, Ms. Holmes spoke to Ms. Fields. Ms. Fields called the Defendant on speaker phone, and Ms. Holmes heard him say "that bitch lied on me, I'm going to kill her." Ms. Holmes called 911 and waited for the police to arrive. The Defendant came over to the house, "trying to rush at [the victim]" and threatening to kill her. Other people had to pull the Defendant away and told him to leave. The Defendant returned to his car and left before the police arrived.

On cross-examination, Ms. Holmes denied that there was bad blood with the victim's father related to the custody of their children. Ms. Holmes agreed that she was not invited to the family gathering at the victim's uncle's house on Mother's Day. However, she denied that anybody asked her to leave. She agreed that she got into an argument with the Defendant and his mother, but she denied getting into an argument with Ms. Fields. Ms. Holmes agreed that the situation was "a big ruckus" and more of a "screaming match" than a polite conversation. Ms. Holmes testified that she and the victim were outside of the home, standing by their vehicle that was parked on the street, while the Defendant was standing in the doorway of the house. Ms. Holmes was focused on the Defendant and protecting her daughter rather than on what other people were saying.

Derek Cutler testified that he works as a forensic DNA analyst for Sorenson Forensics, a private DNA testing laboratory in Salt Lake City, Utah. Mr. Cutler analyzed buccal swabs from the victim, the victim's child, and the Defendant in order to develop DNA profiles and determine the parentage of the victim's child. Mr. Cutler testified that he was not able to exclude the Defendant as the father of the victim's child. Mr. Cutler explained that the test cannot confirm paternity with 100% certainty but can give a statistical likelihood that the person is the father over a random person selected from the

general population. Mr. Cutler testified that the Defendant was 99.99% more likely to be the father of the victim's child than a person randomly selected from the Caucasian, African American, or Hispanic populations.

On cross-examination, Mr. Cutler testified that he was not provided information that the Defendant and the victim were cousins and that he did not test any other male relatives. He explained that the statistics were based off of the likelihood of an unrelated male selected at random being the father. However, if a male relative was suspected to be the father, "there would be additional calculations that would probably bring the number down to account for that but that was never an issue that was presented to us to account for." On redirect examination, Mr. Cutler testified that the fact that the mother and father are first cousins does not change his calculations. Mr. Cutler clarified that the change in the calculation would occur if there was another male relative that was suspected to be the father.

Detective Yolonda Springfield testified that in 2016, she was an investigator in the Sex Crimes Bureau of the Memphis Police Department. As the case officer assigned to this case, Detective Springfield interviewed the victim and presented a photographic lineup to her. Detective Springfield then contacted the Defendant and set up a time for him to come in and give a statement. The Defendant arrived with his mother and grandparents but was taken back to an interview room alone. Detective Springfield testified that the Defendant was not under arrest at that point. Detective Springfield testified that the Defendant indicated that he understood his rights, signed an advice of rights form, and agreed to talk to her without a lawyer. The Defendant's statement was later reduced to writing, which the Defendant was able to review and make changes before signing. The Defendant also agreed to provide a DNA sample.

According to the Defendant's statement, he was aware of the claim by the victim, his first cousin, that he had raped her. The Defendant believed that his grandmother got custody of the victim when the victim was thirteen years old. The Defendant stated that he did not visit his grandmother's house often because he was working as a security guard. The Defendant said that he was never alone with the victim at his grandmother's house because the victim's brother was always around and the Defendant usually went upstairs to his grandparents' room. The Defendant denied touching the victim's body in a sexual manner. When asked if he had shown the victim his penis, the Defendant replied, "Yes. She was using my phone and I was sending pictures to a couple of girls, and she saw them on a text message." The Defendant denied forcing the victim to touch his penis when she was twelve years old, but he agreed that she had touched it voluntarily:

> It was multiple times we got high together and smoked marijuana and drink and black out together. We use to wrestle a lot and she grabbed my penis.

And when she grabbed it we stopped wrestling. She has walked in on me multiple times when I was using the restroom.

When asked if he ever had sex with the victim when she was between the ages of twelve and fourteen years old, the Defendant replied, "Possibly at 13[ years]. That's when her Mom jumped on her that night. We dr[a]nk a whole bottle Paul Masson (Brown Liquor) and blacked out." When asked if he ever had consensual sex with the victim at any age, the Defendant said, "I had [c]onsensual [s]ex with [the victim] when she was 13[ years] old, at least once or twice, but no more than that. I was 18[ years] old working at Imperial Security." The Defendant stated that he was uncircumcised. When asked what kind of sex he had with the victim, the Defendant stated, "If we had sex it was regular sex, penile/vaginal." The Defendant did not know if he ejaculated in the victim's vagina but stated that it was "very possible." The Defendant also said it was possible that he did not use a condom. When asked at what age he had sex with the victim, the Defendant said, "I'm going to stick with 13[ years]." The Defendant described the incident as follows:

> I came to my grandmother's house and I was already under the influence. I seen her and we talked and joked around. I started back drinking. I put the bottle in the refrigerator, she started drinking and we started wrestling and I guess that is when we start[ed] having sex.

The Defendant recalled drinking in the living room of his grandmother's house and waking up on the couch. The Defendant said that he and the victim had vaginal sex. The Defendant admitted that he was a chief enforcer in the Vice Lords gang, explaining that his role was to "teach my young brothers and sisters to get a job, take care of their family, stay out of trouble, and get an education." The Defendant denied being an active member of the gang and denied threatening to harm or kill the victim if she told anyone that he had sex with her. When asked if he was the father of the victim's child, the Defendant said, "I have no idea. I have to wait until the DNA test comes back." When asked if he knew why the victim would say that he was the father, the Defendant said, "All I can think of is that we had sex once or twice, and it's very possible." When asked if he knew why the victim would accuse him of raping her repeatedly between the ages of twelve and fourteen years old, the Defendant said,

> That, I don't know. I guess she was embarrassed about the situation. It won't be the first time she said somebody has raped her. The first time she said her daddy's best friend raped her. The second time she told her boyfriend it was her Mom's friend who raped her.

When asked if there was anything else that he wanted to add to his statement, the Defendant said, "I am 100 percent sure that I never raped her."

On cross-examination, Detective Springfield testified that the Defendant appeared nervous while giving his statement and that his leg was shaking. Detective Springfield agreed that the Defendant initially denied having sex with the victim. Detective Springfield denied that she suggested to the Defendant that it could have happened while he was drunk, explaining that the Defendant stated that on his own. Detective Springfield explained that the Defendant started saying it "maybe" happened once or twice after she told him that the victim reported that it happened twenty-five to thirty times. Detective Springfield did not specifically ask the Defendant if he recalled having sex with the victim in her brother's room. Detective Springfield learned from the Defendant that he had graduated from high school but did not ask whether he had been in special education classes or had a learning disability. On redirect examination, Detective Springfield testified that the Defendant did not appear to have any difficulty understanding either the advice of rights form or the questions being asked.

The parties entered a stipulation that the victim was born on November 24, 1997, and that the Defendant was born on April 14, 1991. The parties also stipulated that the juvenile court records reflected that the victim's paternal grandmother, Carolyn Fields, filed a petition for custody on October 4, 2010, which indicated that the victim had been residing with her for three weeks and was twelve years old at the time. After the State rested its case in chief, the trial court granted the Defendant's motion for judgment of acquittal with regard to the charged offense of aggravated statutory rape in Count Two, finding that the proof did not establish that there was at least a ten-year age difference between the victim and the Defendant.

The Defendant called Carolyn Fields, who testified that she was the grandmother of both the victim and the Defendant. Ms. Fields testified that in 2010, the Defendant would come over to help her care for her bedridden father or when her husband had a seizure. About the same time, the victim and her younger brother began living with Ms. Fields. Ms. Fields testified that the Defendant would come to her house in the evening before going to work at night and that he usually played videogames with the victim's brother. Ms. Fields testified that the victim was never there at the same time as the Defendant because she would go to the house of her cousin or her friend. Ms. Fields testified that occasionally the Defendant would spend the night and that he and the victim's brother would fall asleep on the couch in the den.

With regard to whether the victim had been molested or raped, Ms. Fields testified that the victim had told her that "a guy was messing with her . . . over [at] her daddy's girlfriend['s] house," but Ms. Fields did not know the guy and did not report it. Ms. Fields found out that the victim was pregnant in February of 2012 after the victim's mother took her to the doctor. Ms. Fields initially did not believe it. She denied that the victim was dating or had a boyfriend. The victim initially claimed someone else was the

father of her child until a DNA test confirmed that he was not. Ms. Fields did not learn that the victim believed the Defendant to be the father until Mother's Day in 2016.

Ms. Fields testified that the family was gathered at the home of one of her son's for a Mother's Day dinner. The victim was supposed to come over with one of her friends. Ms. Fields was inside of the house when she heard a commotion outside. When Ms. Fields came outside to see what was going on, the victim told her that the Defendant was the father of her child. Ms. Fields testified that she became upset and told the victim "that she was a liar because ain't [sic] no way I believe that." Ms. Fields called the Defendant and told him what was going on. The Defendant came over and was inside of the house while Ms. Fields was outside arguing with the victim and her mother. Ms. Fields denied hearing anybody threaten to harm or kill anyone. Ms. Fields testified that the "commotion" lasted "[a] couple of hours" and that it ended when the Defendant left and the police arrived.

On cross-examination, Ms. Fields agreed that the victim and the victim's brother began living with her in September 2010 when the victim was twelve years old. She agreed that the victim and the victim's brother shared a bedroom upstairs "for a little while." Ms. Fields testified that the Defendant was not allowed to drink or "smoke drugs" in her house. She also testified that she did not keep alcohol in the refrigerator where the children could get it. Ms. Fields denied ever finding the Defendant passed out or intoxicated, saying "he knew better to come to my house like that" or she "would whoop his butt." Ms. Fields denied ever finding any drugs or seeing the victim drinking or using drugs in her home. Ms. Fields testified that she was not aware that a DNA test had been conducted to determine if the Defendant was the father of the victim's child, but she was convinced that he was "absolutely not" the father because the baby was "normal."

The Defendant testified that he was born on April 14, 1991, and that he graduated from high school in 2009. The Defendant testified that he had been in "resource classes" since the second grade because he "comprehend[s] very slowly." In 2010, the Defendant and his family lived in Horn Lake, Mississippi. The Defendant would visit his grandparents' house every other day, but he did not have the ability to come and go as he pleased. When asked if he ever spent time alone with the victim, the Defendant responded, "When she was telling me about the situation what was going on with her family . . . . some issues on her mother's side of the family." The Defendant testified that in September of 2010, he began working for Imperial Security. The Defendant testified that he worked twelve-hour, overnight shifts and that he only slept at this grandparents' house when he was too tired to make it home in the morning. The Defendant testified that sometimes he got drunk after a stressful situation at work but that it did not happen often, and he did not drink or use drugs at his grandparents' house.

When asked if he ever had sex with the victim, the Defendant responded, "If I did, I don't remember." The Defendant testified that when he gave his statement to Detective Springfield and her partner, his ankle was shackled. The Defendant testified that he became emotional and was crying as they were asking him questions. The Defendant testified that one of the detectives kept telling him "anything is possible," so he started to agree that it was possible. The Defendant testified that he told the detectives that the victim was thirteen because that was how old she was when the Defendant started coming over to his grandparents' house. The Defendant testified that he did not remember having sex with the victim, but "anything is possible. If we did have sex, it wasn't me raping her. . . . It wasn't me about [sic] no force or anything."

On cross-examination, the Defendant testified that although he was diagnosed as "a slow learner," he graduated from high school, had held several jobs since graduating, and was not receiving any disability benefits. The Defendant remembered getting a phone call on Mother's Day in 2016 and being told that the victim was claiming that he raped her and was the father of her child. Although the Defendant agreed that he said that the victim was lying, he denied threatening to kill her, and he denied that the victim was still at his uncle's house when he arrived. The Defendant testified that he was emotional when giving his statement to the detectives and that he did not feel like he could leave. The Defendant agreed that he did not tell the detectives about his work schedule. The Defendant claimed that some of the responses in his statement were "missing and messed up." The Defendant denied drinking with the victim, explaining that the victim drank on her own. The Defendant agreed that his grandmother was not around when he and the victim drank in her house and that she would not have allowed it. The Defendant agreed that he was not sure if he had sex with the victim, but if he did, it was when he was drunk or high. However, the Defendant testified that he was "absolutely sure" how old the victim was because "she wasn't around when she was twelve," although he did not know what year she was born. The Defendant agreed that he was nineteen years old in 2010 and explained that he was confused when he told the detectives that he was eighteen. On redirect examination, the Defendant testified that he did not get a car and start going over to his grandparents' house until November of 2010.

At the conclusion of the proof, the trial court dismissed all possible lesser included offenses in Count Two, finding that the statute of limitations had expired and had not been waived by the Defendant. The trial court informed the jury that it was to only consider the offense of rape of a child charged in Count One. The jury convicted the Defendant as charged. As discussed further below, the trial court imposed a sentence of twenty-eight years at the subsequent sentencing hearing. The trial court overruled the Defendant's motion for new trial on October 8, 2018. The Defendant filed a timely notice of appeal.

**Analysis**

*I. Election of Offenses*

The Defendant argues that the trial court erred in failing to compel the State to make an election of offenses with regard to Count One of the indictment. The Defendant contends that given the victim's testimony suggesting that the Defendant raped her multiple times between the September 2010 incident and November 24, 2010, when she turned thirteen, "there is no way to determine whether all twelve jurors relied upon one specific event to convict Defendant." Further, the Defendant argues that the error was not harmless beyond a reasonable doubt. The State argues that the Defendant waived the issue by failing to raise a contemporaneous objection at trial and contends that the Defendant has not established that the trial court committed plain error. In his reply brief, the Defendant asserts that because the trial court had a duty to compel the State to make an election, the failure to object is not fatal and that he properly preserved the issue by raising it in his motion for new trial.

The Tennessee Constitution protects the right of a criminal defendant to a unanimous jury verdict. *See State v. Lemacks*, 996 S.W.2d 166, 169-70 (Tenn. 1999). In other words, in rendering a verdict, "jurors must unanimously agree on the particular criminal act the defendant committed." *State v. Qualls*, 482 S.W.3d 1, 9 (Tenn. 2016). In most types of cases, unanimity is not a problem because evidence of bad acts committed by the defendant other than the offense alleged in the indictment is generally not admissible because it is irrelevant. *Id*.; *see* Tenn. R. Evid. 404(b) (such evidence may be admissible for limited purposes). However, this rule is relaxed in the context of sexual offenses committed against children over a span of time, and "'evidence of unlawful sexual contact between the defendant and the victim allegedly occurring during the time charged in the indictment is admissible.'" *Qualls*, 482 S.W.3d at 9 (quoting *State v. Rickman*, 876 S.W.2d 824, 827 (Tenn. 1994)). However, this creates "the potential for a non-unanimous jury verdict because 'each unlawful act of carnal knowledge is a separate, substantive offense, rather than a continuous offense.'" *Id*. (quoting *State v. Shelton*, 851 S.W.2d 134, 137 (Tenn. 1993)). Thus, the Tennessee Supreme Court "has consistently held that the prosecution must elect the facts upon which it is relying to establish the charged offense if evidence is introduced at trial indicating that the defendant has committed multiple offenses against the victim." *State v. Johnson*, 53 S.W.3d 628, 630 (Tenn. 2001) (citations omitted). The State must make its election at the conclusion of its case-in-chief and the trial court must properly instruct the jury to ensure that the jury deliberates upon the same conduct. *See Burlison v. State*, 501 S.W.2d 801, 804 (Tenn. 1973). "The two primary purposes of this election requirement are 'to preserve a criminal defendant's right under the state constitution to a unanimous jury verdict, and to allow the State some latitude in the prosecution of criminal acts committed against young children who are frequently unable to identify a specific date on which a particular

offense was committed.'" *State v. Knowles*, 470 S.W.3d 416, 423-24 (Tenn. 2015) (quoting *Rickman*, 876 S.W.2d at 828). "[W]hen it is properly preserved, the issue of whether the election requirement has been satisfied is a question of law, to which de novo review applies." *Qualls*, 482 S.W.3d at 8.

In asserting that this issue has been waived, the State merely relies upon Tennessee Rule of Appellate Procedure 36(a), which states that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." However, the Tennessee Supreme Court has "stressed that the election requirement is a responsibility of the trial court and the prosecution and, therefore, does not depend on a specific request by a defendant." *State v. Kendrick*, 38 S.W.3d 566, 569 (Tenn. 2001); *see also Burlison*, 501 S.W.2d at 804 (holding that the election requirement is "fundamental, immediately touching the constitutional rights of an accused, and should not depend upon his demand therefor"). This Court has previously held that the election issue is not waived when a defendant raised it for the first time in his motion for new trial. *State v. Charles A. Walker*, No. M2005-00165-CCA-R3-CD, 2006 WL 3313651, at *14 (Tenn. Crim. App. Nov. 15, 2006), *perm. app. denied* (Tenn. Mar. 12, 2007). Indeed, the Tennessee Supreme Court has previously criticized this Court for raising the election issue *sua sponte* and reviewing it "as if the defendant had properly preserved it for review on appeal *by raising it in his motion for new trial*, rather than applying the plain error doctrine," suggesting that raising the election issue in a motion for new trial is all that is required to properly preserve it for plenary review on appeal. *Knowles*, 470 S.W.3d at 423 (emphasis added). Because the Defendant raised the issue in this motion for new trial, it is not waived.

In this case, the only count of the indictment submitted to the jury for consideration was Count One, which charged the Defendant with rape of a child occurring before November 24, 2010, which is when the victim turned thirteen years old. *See* T.C.A. § 39-13-522(a) (2010). During direct and redirect examination, the State elicited testimony from the victim about more than just a single incident of sexual penetration by the Defendant, focusing on the on-going nature of the abuse. Much of the testimony at trial related to the victim's pregnancy and the paternity of her child, who was not born until February 2012, about fifteen months after the victim became thirteen years old. However, after the victim testified in detail about the incident in September 2010, the State elicited further testimony suggesting that the abuse continued up to her thirteenth birthday on November 24, 2010. Thus, the trial court should have required the State to make an election with regard to Count One. *See State v. Perry Hinkle*, No. 02C01-9603-CR-00076, 1996 WL 601726, at *5 (Tenn. Crim. App. Oct. 22, 1996) (holding that the State should have been required to make an election when it elicited testimony from the victim about "ongoing offenses" after she testified about one specific incident).

In *Shelton*, the Tennessee Supreme Court held that when a victim provided detailed testimony about one specific incident of penile penetration and testified only "in very general terms" about other incidents of digital penetration, the failure to make an election was harmless beyond a reasonable doubt. 851 S.W.2d at 138. As this Court has previously explained:

> [M]inor references to other instances of sexual contact which are made only in general terms, and the subsequent failure to elect by the State, are, in some circumstances, harmless error beyond a reasonable doubt. This is particularly so when the witness describes the charged incident with particularity, in other words, with sufficient detail of time, place, and method, such that the jury is able to consider the charged incident and rely on the one particular instance in rendering its verdict.

*State v. Cayle Wayne Harris*, No. M2004-00049-CCA-R3-CD, 2005 WL 2255488, at *16-17 (Tenn. Crim. App. Aug. 23, 2005) (citing *State v. Kenneth Lee Herring*, No. M1999-00776-CCA-R3-CD, 2000 WL 1208311, at *7-8 (Tenn. Crim. App. Aug. 24, 2000), *perm. app. denied* (Tenn. 2001)) (internal quotations omitted), *no perm. app. filed*.

In *Perry Hinkle*, cited above, this Court held that although the State should have been required to make an election after eliciting testimony about "ongoing offenses," the failure to do so was harmless beyond a reasonable doubt because it was "unlikely that a jury could have convicted the [d]efendant for any other incidents based on the proof offered." 1996 WL 601726, at *5. This Court noted that "the overwhelming majority of detailed evidence presented at trial concerned the first incident in the guest room." *Id*. On the other hand, there were "[n]o details" about the other incidents other than the victim's "acknowledgment that it had happened again, in her bedroom." *Id*. The victim "was unable to describe or estimate the number of times or any identifying details about any other occurrences." *Id*. Thus, the jury "had no real option of selecting from a group of offenses on which to convict." *Id*.; *see also Charles A. Walker*, 2006 WL 3313651, at *15 (holding that the failure to make an election was harmless error with regard to two counts of rape because the victim "described only two incidents in detail" and there was "no danger that the jurors might have been considering different offenses when deliberating on those counts"); *State v. James Webb*, No. 02C01-9512-CC-00383, 1997 WL 80971, at *10 (Tenn. Crim. App. Feb. 27, 1997) (concluding the failure to make an election was not reversible error when "the only incident described in any detail by the victim was the 1982 rape" and "[t]he victim made only vague and brief reference to the other incidents"), *perm. app. denied* (Tenn. Nov. 10, 1997); *State v. Clabo*, 905 S.W.2d 197, 204-05 (Tenn. Crim. App. 1995) (holding that "[t]he minor innuendos about another incident were harmless").

Like in *Perry Hinkle*, the victim in this case provided very detailed testimony regarding the "first time" that the Defendant raped her in September 2010. The victim testified about such details as the color of the shorts the Defendant was wearing when he tried to make her touch his penis in the living room, the show she was watching on television after she went to the bedroom she shared with her brother, how the Defendant touched her, and what the Defendant said to her when she complained that it hurt. The remainder of the victim's testimony was vague with regard to whether other instances of penetration occurred prior to November 24, 2010. When the prosecutor asked whether the September 2010 incident was "the only time it happened," the victim responded, "No. . . . He used to come over almost every weekend, so I can't just say. It was pretty often. I don't -- I can't just give a number of times but it was often." The victim testified that "it" not only happened in Memphis but also at the Defendant's mother's house in Mississippi, which clearly would have been outside of the jurisdiction of the trial court. The prosecutor asked if "it continue[d] on after your thirteenth birthday" on November 24, 2010, to which the victim responded, "Yes," and proceeded to testify about her pregnancy in February 2012 and about the "last time" the Defendant raped her in May 2011, which clearly did not occur within the timeframe of Count One. Later in her testimony, the victim testified that "it" was not always vaginal penetration and that the Defendant had "done anal before," but she did not specify whether this type of penetration occurred before or after November 24, 2010. The victim testified that "it happened so often" that she stopped saying no.

Based on this proof, we conclude that failure to make an election was harmless beyond a reasonable doubt. The victim provided detailed testimony about only one incident of penetration during the timeframe of Count One. Her testimony with regard to the rape that occurred on September 2010 was sufficiently specific and detailed with regard to time, place, and method that there was no reasonable likelihood that some of the jurors may have convicted the Defendant based on her vague and generalized assertions that "it happened" on other, unspecified occasions. The Defendant is not entitled to relief on this issue.

## II. Sufficiency of the Evidence

In challenging the sufficiency of the evidence, the Defendant again relies on his contention that the State was required to make an election of offenses with regard to Count One and asserts that this Court is precluded from reviewing the sufficiency of the evidence "because it is unclear exactly which act the jury relied upon to convict Defendant." Additionally, the Defendant argues that the evidence is insufficient because "no reasonable jury could have believed the victim's testimony in this case." The State responds that the jury clearly accredited the victim's testimony over the Defendant's and that the evidence sufficiently supports a conviction for rape of a child. We agree with the State.

- 14 -

When a defendant challenges the sufficiency of the evidence, this court is obliged to review that claim according to certain well-settled principles. The relevant question is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). The jury's verdict replaces the presumption of innocence with one of guilt; therefore on appeal, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)). Questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *Reid*, 91 S.W.3d at 277 (quoting *Bland*, 958 S.W.2d at 659). It is not the role of this court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Id*. The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

Rape of a child is defined as "the unlawful sexual penetration of a victim by the defendant . . . if the victim is more than three (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-13-522(a) (2010). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's . . . body, but emission of semen is not required." T.C.A. § 39-13-501(7) (2010).

In the light most favorable to the State, the evidence presented in this case establish that in September of 2010, the victim and her younger brother began residing with their grandmother for several weeks before the grandmother petitioned the juvenile court for custody. The Defendant, who is the victim's first cousin, visited the grandmother's house regularly. One night in September 2010, the Defendant and the victim were in the living room watching television when the Defendant pulled the victim onto his lap, pulled out his penis, and asked the victim to play with it. The Defendant pulled the victim's hands down toward his penis, but the victim pulled away. The victim had never seen the Defendant's uncircumcised penis before. The victim went to her bedroom and began dozing on the king-sized bed she shared with her younger brother,

who was a "hard sleeper." The Defendant came into the room, pulled the victim's pants down, and told her to be quiet. The Defendant penetrated the victim's vagina with his penis. The victim said "ouch, stop it," and the Defendant replied "it's okay, it's nothing but my dick biting you." The rape lasted two or three minutes before the Defendant left the room and told the victim to go to the bathroom. The victim was twelve years old at the time, and she recalled that the rape occurred two months before her thirteenth birthday. From this evidence, a rational jury could easily conclude that the Defendant sexually penetrated the victim when she was less than thirteen years of age.

The Defendant contends that the victim's testimony "is simply incredible" because she claimed that her brother was in the same bed while the rape was happening and that she never screamed to try to awaken him or her grandparents. Additionally, the Defendant argues that the victim's credibility was called into question by the fact that she lied about the paternity of her child and because she did not report the rape until 2016. On the other hand, the Defendant asserts that his testimony and statement to police, in which he claimed that any sexual contact occurred only after the victim turned thirteen years old, "were quite credible." However, by its verdict, the jury clearly accredited the testimony of the victim over that of the Defendant, as was its prerogative. *See Reid*, 91 S.W.3d at 277. This Court does not second-guess the jury's credibility determinations on appeal. The Defendant is not entitled to relief on this issue.

## III.  Sentencing

The Defendant argues that the trial court erred in imposing a Range II sentence of twenty-eight years. The State concedes that the trial court erred by sentencing the Defendant based on the statute in effect at the time of trial rather than the statute in effect at the time of the offense.

The general rule is that "a criminal offender must be sentenced pursuant to the statute in effect at the time of the offense." *State v. Smith*, 893 S.W.2d 908, 919 (Tenn. 1994). The current version of Tennessee Code Annotated section 39-13-522(b)(2)(A), which became effective January 1, 2012, provides the following with regard to the punishment for a conviction for rape of a child:

> Notwithstanding title 40, chapter 35, a person convicted of a violation of this section shall be punished as a Range II offender; however, the sentence imposed upon such person may, if appropriate, be within Range III but in no case shall it be lower than Range II.

T.C.A. § 39-13-522(b)(2)(A) (2012). At the time of the offense in this case, the statute provided as follows:

Notwithstanding title 40, chapter 35, a person convicted of a first or subsequent violation of this section shall be punished by a minimum period of imprisonment of twenty-five (25) years. The sentence imposed upon any such person may, if appropriate, exceed twenty-five (25) years, but in no case shall it be less than the minimum period of twenty-five (25) years.

T.C.A. § 39-13-522(b)(2)(A) (2010). In construing this version of the statute, this Court has held that if the defendant is a Range I offender, "the sentence to be imposed must be twenty-five years for each offense of rape of a child" because that is the maximum sentence for that range. *State v. William "Bill" Douglas Farr, Sr.*, No. M2016-01216-CCA-R3-CD, 2017 WL 4280701, at *7 (Tenn. Crim. App. Sept. 26, 2017) (quoting *State v. Rhonda Louise Medley*, No. M2009-02446-CCA-R3-CD, 2011 WL 2739512, at *7 (Tenn. Crim. App. July 12, 2011), *perm. app. denied* (Tenn. Nov. 16, 2011)), *perm. app. denied* (Tenn. Jan. 17, 2018).

At the sentencing hearing, the parties agreed that the Defendant was a Range I offender. However, the trial court stated that his range of punishment was twenty-five to forty years, which is the range of punishment for a Range II offender. *See* T.C.A. § 40-35-112(b)(1). There is no question that the offense in this case occurred before January 1, 2012. Thus, according to the statute in effect at the time of the offense, the minimum statutory sentence of twenty-five years for the Defendant was also the maximum possible sentence for the Defendant. *See William "Bill" Douglas Farr, Sr.*, 2017 WL 4280701, at *7. Thus, the trial court erred in imposing a Range II sentence of twenty-eight years, and the Defendant's sentence must be modified to twenty-five years.

## Conclusion

Based on the foregoing, we affirm the Defendant's conviction but modify his sentence to twenty-five years and remand the case to the trial court for entry of an amended judgment.

_____
THOMAS T. WOODALL, JUDGE